**E-FILED**
Wednesday, 18 March, 2009  04:01:59 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CARL WILLIAMS,
     Plaintiff,

     vs.                          06-1205

DR. RAVANAM, et.al.,
     Defendants.

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' motions for summary judgment [d/e 93, 99] and the plaintiff's responses.

The plaintiff, a state prisoner, filed his lawsuit pursuant to 42 U.S.C. §1983 claiming his constitutional rights were violated at the Hill Correctional Center.   The plaintiff has the following surviving claims:

> 1) Defendants Dr. Srinivas Ravanam, Dr. William Rankin, Warden Frank Shaw, Dr. Craig Svobado, Dr. Sylvia Mahone, Dr. Liping Zhang, Wexford Health Sources, Health Care Administrator Lois Lindorff-Mathes**,** Illinois Department of Corrections Director Roger Walker and Administrative Review Board Member Jackie Miller violated the plaintiff's Eighth Amendment rights when they were deliberately indifferent to his serious medical condition; and,
> 2) Defendants Dr. Ravanam, Dr. Rankin, Dr. Shaw, Dr. Svobado, Dr. Mahone and Dr. Zhang conspired with Wexford Health Source to deprive the plaintiff of his Eighth Amendment rights.

In his complaint, the plaintiff alleged that on September 14, 2004, he was sent to an outside hospital for a sonogram and a tumor was discovered.  The plaintiff alleged that the defendants refused to provide him the necessary care and he continued to experience pain.  The court noted that the documents attached to the plaintiff's original complaint, did not necessarily support his claims. Nonetheless, the court could not say that the plaintiff could prove no set of facts which would entitle him to relief. *See* September 12, 2006 Court Order; March 17, 2008 Case Management Order.

## II.  FACTS

Dr. William Rankin states that he works for Wexford Health Sources, Inc. and is the Medical Director at East Moline Correctional Center.  Dr. Rankin says he occasionally is asked

to fill in at other prisons such as Hill Correctional Center.    Dr. Srinivas Ravanam and Dr. Svoboda says they also worked for a period of time as a physicians at Hill Correctional Center. (Def. Memo, Ravanam Aff, p. 1), (Def. Memo, Svoboda Aff. p. 1 ).

On February 5, 2004, the plaintiff was housed a Menard Correctional Center and reported that he had a lump above his penis on the left side.  He was scheduled for a doctor's examination which occurred the next day.  The plaintiff told the doctor he had an inguinal hernia.  The doctor told the plaintiff to avoid heavy lifting and return to the medical department as needed.  (Def. Memo, Svoboda Aff. p. 10-11).

From March 19, 2004 to April 3, 2004, the plaintiff was seen and treated four times for genital warts.  (Def. Memo, Svoboda Aff. p. 11-13) On May 5, 2004, the plaintiff was transferred to Hill Correctional Center where his treatment for genital warts continued.  From May 5, 2004 until July 1, 2004, the plaintiff was examined and/or treated by medical staff at least 18 times.  (Def. Memo, Svoboda Aff. p. 13-18).  The plaintiff does not complain of other medical conditions.

In July of 2004, the plaintiff was seen on two occasions due to an injury he received while in the yard.  On August 23, 2004, the plaintiff saw a license nurse and complained that his genitals were swollen and painful.  Tylenol was prescribed and a doctor's visit was arranged. (Def. Memo, Svoboda Aff. p. 20).   The plaintiff was examined a second time by a nurse practioner on August 25, 2004.  The plaintiff reported mild tenderness and the nurse indicated that based on her examination, she felt the plaintiff may have been suffering from a hydrocele. (Def. Memo, Svoboda Aff. p. 20-21)

Dr. Svoboda explains that a hydrocele is when a:

sac surrounding a testicle fills with fluid, resulting in swelling of the scrotum.  It is common amongst male infants, and most of the time, the swelling goes away on its own without any treatment. Hydroceles usually are not painful, or harmful, but may be an indication of other problems.  (Def. Memo, Svoboda Aff. p. 21).

The plaintiff was examined by Dr. Seaver on August 31, 2004 who felt the plaintiff was suffering from an undescended testicle with a hydrocele.   Dr. Seaver decided to request an ultrasound to assist in his diagnosis.   The test was approved and conducted at an outside hospital in September of 2004.  (Def. Memo, Svoboda Aff. p. 22-23).

The results of the ultra sound revealed a mass above the left testis.  However, the report states that the "nature of this mass or mass-like structure is not certain." Sept. 14, 2004 Radiology Report.  Dr Seaver says it might be a inguinal scrotal hernia or a type of tumor.  The

report also noted a hydrocele.

On October 10, 2004, the plaintiff was seen by a nurse complaining of pain.  However, after examining the plaintiff, the nurse indicated that she saw no objective indication of pain. The nurse assesses that the plaintiff is suffering from discomfort.  She prescribes Advil, asks the plaintiff to return to the Health Care Unit and says he can return to work.  (Def. Memo, Svoboda Aff. p. 25).

The plaintiff missed a medical visit on October 15, 2004, but again saw a nurse on October 18, 2004.  The plaintiff stated he had the same problem in his groin area and wanted to see a doctor about his test results.   The plaintiff did see a doctor on October 25, 2004, and the doctor notes the plaintiff is under no apparent distress.  The doctor refers the plaintiff to the medical director for further evaluation in one week.

On November 1, 2004, the plaintiff is examined by a doctor who notes that the plaintiff does report pain in his groin area.  The doctor assesses the problem as an inguinal hernia.  The doctor notes that the plaintiff needs to see a urologist, prescribes a hernia belt and tells the plaintiff to layoff from work.  (Def. Memo, Svoboda Aff. p. 26-27).

On January 12, 2005, the plaintiff's medical chart is reviewed.  It was determined that the plaintiff's hernia was likely not in need of surgery because it seemed to be reducible.  This means that it could be returned to the abdominal cavity by either the patient lying on his side or the physician applying pressure with his fingers.  (Def. Memo, Svoboda Aff. p. 27-28) It was determined that more documentation was needed and the signs and symptoms of a more serious problems needed to be reviewed with the plaintiff.

On January 20, 3005, Dr. Rankin evaluated the plaintiff and noted that his hernia was easily reducible.  The doctor advises the plaintiff to wear his hernia belt and states that there is no need for a urologist appointment.  (Def. Memo, Svoboda Aff. p. 28)   The plaintiff was seen by optometry or medical staff on January 24, April 6 and June 7 of 2005.  None of the visits referred to the plaintiff's hernia.

On June 26, 2005, the plaintiff was seen by a nurse.  The plaintiff claimed that a sonogram had determined he had a tumor and he needed follow up care.   The plaintiff was scheduled for an examination with a doctor, but he did not show for the appointment.  (Def. Memo, Svoboda Aff. p.  290)

The plaintiff was seen by optometry or medical staff on July 28, August 7, and September 3, 2005, but the visits did not concern the plaintiff's hernia.  On September 6, 2005, the plaintiff made a request to see a urologist.

On September 13, 2005, the plaintiff was examined by Dr. Ravanam.  The plaintiff is complaining about swelling and pain in his left testis.  The doctor examined the plaintiff and noted that his tests demonstrated the mass was not a tumor but a hydrocele.  The doctor noted the plaintiff stated he was in great pain..."while sitting comfortably, smiling and talking in a threatening and intimidating fashion."  (Def. Memo, Svoboda Aff. p. 31)  The plaintiff did not want to answer the doctor's questions and indicated a plan to sue the facility.  Motrin was prescribed for the plaintiff and a blood test and testosterone test were ordered.

Dr. Svoboda says the "alpha-fetoprotein" blood test that was ordered can be used to detect tumors.  The doctor also notes that not all tumors are cancerous and the "alpha-fetoprotein blood test was yet another way to objectively rule out cancer as the cause of the mass." (Def. Memo, Svoboda Aff. p. 31-32).  In addition, the doctor says testosterone levels can also indicate testicular tumors and therefore this test was another way to rule out the possibility of a tumor. (Def. Memo, Svoboda Aff. p. 32).  The two tests were performed on September 23, 2005.

On September 26, 2005, the lab results were returned.  Both of the test results were found to be within normal limits and provided "further objective evidence that (the plaintiff's) scrotal mass was not cancerous."  (Def. Memo, Svoboda Aff. p. 33).

On October 28, 2005, the plaintiff met with Dr. Svoboda for the first time to discuss his lab work.  The doctor examined the plaintiff and reviewed the results.  The doctor noted the plaintiff had a right hydrocele and a left inguinal hernia.  The doctor also noted that the plaintiff displayed threatening behavior during the visit and he demanded "forbidden" materials.  (Def. Memo, Svoboda Aff. p. 34)  Tylenol was prescribed and the plaintiff was told to return to the Health Care Unit if his hernia became painful or unreducible.  In addition, the doctor put in a request for urologist visits, and asked for a follow up visit in a month.  (Def. Memo, Svoboda Aff. p. 33-34).

The urology evaluation was not approved. The consult form instead directed to "[t]reat symptomatically-most hydroceles will resolve."  (Def. Memo, Svoboda Aff. p. 35)

The medical record also contains notes from a registered nurse who saw the plaintiff during her segregation visits.  During 18 visits from October 29, 2005 to November 19, 2005, the plaintiff indicated he had no complaints.

On November 22, 2005, the plaintiff told the registered nurse he wanted a furlough.  On December 5, 2005, Dr. Svoboda responded to a grievance from the plaintiff with the following memorandum:

(The plaintiff) was seen by me on 10/28/05 for chronic problems with hydrocele and probable hernia.  He has had this evaluated by ultrasound on 9/14/2004-this problem

4

has been under evaluation for over a year and he is elusive as to how long he has
actually had it.  When seen by me, he denied any pain or recent change, but
given the vague ultrasound report, wished to pursue urology evaluation of this
which I felt appropriate and requested, as is our procedure, the Director of
Nursing faxed copies of his ultrasound report , the various progress notes,
and labs to HPL for approval.  This request was denied by HPL ......
The hernia or other possible findings on ultrasound were not addressed by
HPL.  It should be noted that this has been addressed and denied in the past
with past requests for urological review.  Additionally, the inmate was insolent,
threatening, and demanding of contraband drugs during this encounter as
detailed in my progress notes. He also threatened grievance and lawsuits if he
was denied evaluation.  He wants a furlough.  He has not to my information
attempted to contact me.  I will recommend follow-up in clinic.  It should be
noted that he behaved similarly with Dr. Ravanam... (Def. Memo, Svoboda Aff. p. 38)

On December 23, 2005, Dr. Svodoba re-examined the plaintiff.  The plaintiff complained
of occasional brief pain to his groin area.  The plaintiff also reports that the inguinal mass has
changed in size now and then and the doctor notes that the hydrocele has reduced.  Tylenol was
prescribed and the doctor asked for review of whether a further ultra sound test was needed.

On December 28, 2005, a collegiatorial review was held and it was recommended that no
urological refer be made at the time. However, the doctors recommended a further ultrasound
test.  The plaintiff was also evaluated again by Dr. Svoboda on December 28, 2005 and January
11, 2006.   The doctor notes no evidence of pain and notes improvement in the plaintiff's
condition. (Def. Memo, Svoboda Aff. p. 40-42)

The ultra-sound was conducted on January 26, 2006.  No masses were detected.   The
results were reviewed with the plaintiff on February 1, 2006.  The plaintiff stated he was not in
pain, but "said he felt aggravated that it did not say that he had a tumor and that he needed to
leave..." (Def. Memo, Svoboda Aff. p. 43)   The doctor recommended a referral to urology to
discuss the removal of the plaintiff's undescended right testes.

A collegial review was held the next day.  It was recommended that doctors follow up
with another ultrasound test in six months before considering a surgical alternative.   The
plaintiff was seen and/or treated by medical staff on 8 occasions from February 24, 2006 to
September of 2007.  On most occasions, he did not report experiencing groin pain.

On September 20, 2007, the follow up ultrasound test was conduced.  The results showed
an undescended right testicle and a large left hydrocele.  No other abnormality was noted.  (Def.
Memo, Svoboda Aff. p.  48).   The plaintiff was re-examined by medical staff on various
occasions before his transfer to Pontiac Correctional Center in December of 2007.

In July of 2007, the plaintiff was examined by a doctor at the University of Illinois Medical Center.   The doctor noted the undescended right testicle, a left-sided hydrocele and a reducible, non-tender inguinal hernia.  There were no other obvious masses.  The doctor noted while the plaintiff had some chronic pain with his hernia, he did not report acute pain.   The doctor discussed with the plaintiff the option of having elective surgery to repair his hernia at the same time as the operation for his right undescended testicle.   The plaintiff said he understood the risks and elected to have both procedures done.  (Def. Memo, Svoboda Aff. p. 52-53)

The surgery was performed on January 25, 2008.  "[A]fter microscopically examining (the plaintiff's) tissue samples after surgery, no malignancy or cancer was found by the reviewing pathologist at the University of Illinois-Chicago Medical Center."  (Def. Memo, Svoboda Aff. p. 58).

The plaintiff states that although he did not agree with the care he was receiving, he was under a doctor's care the entire time he was at Hill Correctional Center. (Def. Memo, Plain. Depo, p. 88)

Dr. Svoboda says his treatment of the plaintiff was based on his medical judgement and years of treating patients.  Dr. Svoboda and Dr. Rankin say their decisions were based not only on the plaintiff's claimed symptoms, but also on the objective information including laboratory tests and ultrasound results.  "As can be seen, the medical records show that the plaintiff had a hydrocele, reducible inguinal hernia and undescended right testicle.  He did not have a malignancy or cancer in his scrotal area."  (Def. Memo, Svoboda Aff. p. 59) "In this case, (the plaintiff) was treated properly as evidence by the ultrasound, laboratory and pathology results." (Def. Memo, Svoboda Aff. p. 60)

Dr. Rankin and Dr. Ravanam both say that based on their opinions as doctors and their evaluation of the plaintiff's medical records, "he had no serious medical health need during the time in question that was not properly addressed." (Def. Memo, Dr. Rankin Aff, p. 2) (Def. Memo, Dr. Ravanam Aff, p. 2).

Lois Lindorff-Mathes says she is the Healthcare Administrator at Hill Correctional Center and is responsible for overseeing the daily operations of the health care unit.  Mathes says she is not a doctor nor is she trained or licensed to diagnosis medical conditions or prescribe medication or treatment. (Def. Memo, Mathes Aff, p. 1)   Mathes outlines that each time the plaintiff filed a grievance concerning medical care, she consulted the relevant portion of his medical records and either indicated what the doctor had stated or referred his question to a doctor for follow-up.

All decisions regarding the proper treatment of Plaintiff's medical condition were made by Plaintiff's treating physicians.  I do not have the authority to refer

inmates for outside treatment.  I do not have the authority to or training to override the medical decisions made by doctors.  I had no reason to believe the decisions made by Plaintiff's treating physicians regarding the Plaintiff's medical care were improper. (Def. Memo, Mathes Aff, p. 3).

Frank Shaw says he was the Warden at Hill Correctional Center from August 1, 2005 to August 1, 2006.  Shaw says to the best of his knowledge, he did not personally review any grievances submitted by the plaintiff.  However, if he did, his denial was based on the recommendations of investigating grievance officer and correctional counselor. Shaw says he is not a licensed physical and does not have authority to override treatment prescribed to an inmate. "As the Warden of Hill Correctional Center I relied on the facility medical professionals to adequately diagnose and treat the medical problems of the offenders." (Def. Memo, Shaw Aff. P. 2).  The plaintiff says he sued Defendant Shaw because his name appears on the responses to his grievances. (Def. Memo, Plain Depo, p. 88)

The plaintiff says his claim against Defendant Jackie Miller is based on the fact that she denied his grievances. (Def. Memo, Plain. Aff, p. 79)  Defendant Miller says she is the Chairperson of the Office of Inmate Issues.   Miller says on October 5, 2005, she recommended that the plaintiff's grievance be denied.  She says this decisions was based on a review of all the available information.  Miller says it was the opinion of the Administrative Review Board that the plaintiff's medical issues had been appropriately addressed by the medical staff.  Miller says she has no medical training and when reviewing medical grievances, her review is limited to whether the inmate is receiving care.  "I cannot overrule the medical decisions of the doctors treating the inmate." (Def. Memo, Miller Aff, p. 1-2).

Terri Anderson say she is the Manager of the Office of Inmate Issues and her duties include overseeing the record keeping for the Administrative Review Board.  Anderson states that the Director of the Illinois Department of Corrections, Roger Walker, did not personally review any of the grievances filed by the plaintiff. (Def. Memo, Anderson Aff., p. 1).  The plaitniff says his claim against Defendant Walker is based on the denial of his grievances. (Def. Memo, Plain. Aff. P. 78).

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c.  Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## IV. ANALYSIS

### A. MEDICAL DEFENDANTS

Defendants Dr. Ravanam, Dr. Rankin, Dr. Svoboda, Dr. Zhang, Dr. Mahone and Wexford Health Sources, Inc. argue that the plaintiff has failed to demonstrate that they violated the plaintiff's Eighth Amendment rights. The defendants state there is no evidence they were deliberately indifferent to the plaintiff's serious medical condition.

The plaintiff must pass both an objective and a subjective test in order to establish that a defendant violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*. The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

8

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

The defendants argue that the medical record clearly demonstrates that the plaintiff was provided constant medical care including numerous evaluations and medical tests. The plaintiff's main contention is that an ultra sound performed on September 14, 2004 demonstrated that the plaintiff possibly had a tumor and the doctors refused to refer him to a urologist for further evaluation.

The September 14, 2004 test indicates that the plaintiff had a mass-like structure and a tumor was one possibility. The report also states the mass could be an inguinal hernia. The report does not state that the plaintiff needs immediate surgery, nor does it make any other recommendation. The medical record demonstrates that the doctors continued to monitor the plaintiff and performed various other tests to determine the source of the mass. The fact that the plaintiff believe a biopsy should have been performed and the tests should have been performed more quickly does not state a violation of his Eigthth Amendment rights. *see Snipes*, 95 F.3d at 591 ("mere disagreement with the course of [the inmate's] medical treatment [does not constitute] an Eighth Amendment claim of deliberate indifference").

The plaintiff did not in fact have a tumor and there is no medical evidence before the court that the plaintiff had cancer. The plaintiff did have a reducible, inguinal hernia. Other courts have noted that a "reducible hernia is generally not a medical emergency, and immediate surgery is not always indicated. " *Turley v. Smith*, 2005 WL 1838349 at 1 (N.D. Ill. 2005).

The plaintiff also points out that it was recommended on two occasions by a treating physician that he see an outside urologist, but the recommendation was denied when reviewed by other physicians. Again, the plaintiff has failed to demonstrate a violation of his constitutional rights. Differences of opinion among medical personnel concerning what is appropriate treatment do not constitute deliberate indifference. *See Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 2006)("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."); *see also minix ex rel. Zick v. Canarecci,* 2007 WL 1970936 at 13 (N.D. Ind. 2007)(the court cannot say the differences in the doctors' opinions permits a trier of fact to conclude the nurses' decision was a substantial departure from accepted professional judgment).

9

The court does recognize that a failure to treat a chronic, painful condition can rise to the level of an Eighth Amendment violation. *Gutierrez v. Peters*, 111 F.3d 1364, 1369-71 (7TH Cir.1997). However, the plaintiff does not make the argument that he suffered in severe pain during this time frame. His main argument is he does not believe he received the proper treatment after the September 2004 ultrasound. In addition, the court notes the medical record does not support a claim that the plaintiff suffered in chronic, serious pain during this time frame.

The plaintiff is attempting to bring a claim that the defendants committed medical malpractice under the guise of an Eighth Amendment claim. Courts have repeatedly held that the Eighth Amendment is not a vehicle for bringing claims for medical malpractice. See *Estelle*, 429 U.S. at 105; *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) ("[T]he courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners."); *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir.1996) ("Medical malpractice ... is not a violation of the [Eighth] Amendment."). Medical decisions that may be characterized as "classic example [s] of matter[s] for medical judgment," such as whether one course of treatment is preferable to another, are beyond the Amendment's purview. *Estelle,* 429 U.S. at 107. Such matters are questions of tort, not constitutional law. The motion for summary judgement as to the medical defendants is granted.

## B. NON-MEDICAL DEFENDANTS

Defendants Miller, Shaw, Mathes and Walker argue that the plaintiff has either failed to show they were personally involved in the plaintiff's claims or the plaintiff has failed to show they were deliberately indifferent. The court agrees.

The plaintiff has failed to demonstrate that Defendant Lindorff-Mathes was deliberately indifferent to his serious medical condition. The record clearly demonstrates that each time the plaintiff filed a grievance, Defendant Mathes reviewed the medical file and responded by either clarifying what the doctor had previously ordered or by referring the plaintiff's question to a doctor for a response. The defendant made sure the plaintiff was receiving medical care. However, the defendant is not a medical doctor nor does she have the authority to diagnose or prescribe medication or treatment. This defendant had no reason to believe the decisions of the medical professionals were improper or that the plaintiff was not receiving the appropriate care. The court has also held that the doctors were not deliberately indifferent to the plaintiff's serious medical needs.

Both Defendants Shaw and Miller also denied the plaintiff's grievance based on the information available to them. Neither of these defendants are medical professionals, but did confirm that the plaintiff was receiving on-going medical care. "Prison administrators, having no

medical expertise, must rely on those with such medical expertise to assess the needs of prisoners and initiate treatment." *Karraker v Peters,* 1995 WL 508074 at 4 (Aug. 18, 1995); *McEachern v Civiletti,* 502 F. Supp 531, 534 (N.D. Ill. 1980).

In addition, the defendants have demonstrated that Illinois Department of Corrections Director Walker had no personal responsibility for the plaintiff's claims.  An individual is liable under §1983 only if he or she was "personally responsible for the deprivation of a constitutional right." *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995).  Personal responsibility means participating directly in the constitutional violation or directing the unconstitutional conduct.  The mere fact that a defendant was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under  42 USC §1983.  *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992).  A supervisor cannot be held liable for the errors of his subordinates.

Since the plaintiff has not demonstrated that any of the defendants violated his Eighth Amendment rights, he can not demonstrate that the defendants engaged in a conspiracy to deny him this constitutional right.  The motions for summary judgement are therefore granted as to all claims against all defendants.

**ITS IS THEREFORE ORDERED that:**

**1) The defendants' motions for summary judgement are granted pursuant to  Fed. R. Civ. P. 56. [d/e 93, 99]   The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order.  The parties are to bear their own costs.  This case is terminated.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available.  If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly**

**payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety.  The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change.  Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 18th  day of March, 2009.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE